2004 WY 69

**SIMPSON PERFORMANCE PROD-
UCTS, INC., Appellant (Defen-
dant),**

v.

**ROBERT W. HORN, P.C.,
Appellee (Plaintiff).**

No. 03–126.

Supreme Court of Wyoming.

June 18, 2004.

Representing Appellant: David B. Hooper of Hooper Law Offices, P.C., Riverton, Wyoming.

Representing Appellee: Robert W. Horn of Robert W. Horn, P.C., Jackson Hole, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] The appellant, Simpson Performance Products, Inc. (SPP), hired the appellee, Robert W. Horn (Horn), to conduct an investigation and to provide legal counsel regarding a possible lawsuit by SPP against the National Association of Stock Car Auto Racing (NASCAR). Upon completing his work, Horn submitted a bill to SPP for $40,383.29 for legal fees and costs. SPP paid Horn $20,000.00, but refused to pay the balance. Horn sued SPP to collect the outstanding amount. The district court found in favor of Horn. SPP now appeals, claiming that Horn is not entitled to the entire fee because his representation of E.J. "Bill" Simpson (Simpson), individually, violated Rule 1.9 of the Wyoming Rules of Professional Conduct for Attorneys at Law (Rule 1.9). Finding no violation of Rule 1.9, we affirm.

## ISSUE

[¶ 2] Horn represented SPP in investigating a possible lawsuit against NASCAR. He then represented Simpson, who had recently resigned as the CEO of SPP, in a lawsuit against NASCAR involving the same facts and cause of action. The issue presented by this case is whether Horn's representation of Simpson, his new client, was "materially adverse" to SPP, his former client, and therefore a violation of Rule 1.9.

## FACTS

[¶ 3] SPP manufactures and sells automobile racing safety equipment such as fire-resistant driver suits, helmets, shoes, seatbelts and other products. In 1998, Simpson, the company's founder, sold a two-thirds interest in the company to Carousel Capital. Simpson retained his one-third share and remained involved with the company, acting as the Chairman of the Board of Directors and Chief Executive Officer.

[¶ 4] On February 18, 2001, Dale Earnhardt died in a racing accident at the Daytona 500. Five days later, NASCAR held a press conference where a NASCAR representative displayed an SPP brand seatbelt and stated that it had broken in the crash. Further, the NASCAR representative asserted that had the seatbelt not failed, Earnhardt would have survived the accident.

[¶ 5] The negative publicity resulting from the NASCAR press conference threatened SPP's reputation and financial well-being. SPP hired Epley and Associates, a public relations group, to assess the situation and to propose a plan to counter the negative publicity. Additionally, SPP considered a slander/false-light lawsuit against NASCAR, and was concerned with a potential wrongful death suit by the Earnhardt family. Nelson Schwab (Schwab), Carousel Capital's managing partner, and Simpson agreed to hire two attorneys to "gather information and facts surrounding the accident in case there was a possible lawsuit." Robert Horn, a Jackson lawyer who had performed some prior work for Simpson, and Jim Voyles, a lawyer from Indianapolis, Indiana, were hired in March of 2001 to perform this task. No formal en-

gagement letter was drafted;[1] however, it was agreed that Horn would bill SPP "at 200 an hour for non-court time and 250 for court time, and that the cost of the case would be borne by Simpson Performance Products."

[¶ 6] From March 28, 2001, to September 9, 2001, Voyles and Horn provided legal services to SPP. They actively participated in an investigation conducted by NASCAR into the cause of Dale Earnhardt's death. During that time, Horn billed approximately 200 hours and incurred expenses relating to three trips: two to Indianapolis, Indiana, and one to Atlanta, Georgia. Another substantial expense involved documenting and cataloguing all of the articles and press releases concerning the highly publicized case.

[¶ 7] Simpson was saddened and distraught by the death of Earnhardt, who was a personal friend, and even more upset that SPP was being partly blamed for the tragedy. He was quite steadfast in his desire to sue NASCAR, and felt that a lawsuit was necessary to clear the company's name and protect its reputation. However, Schwab did not share Simpson's view. Schwab felt the only way to stabilize SPP and maintain its viability was to work with NASCAR and preserve that relationship. In August of 2001, Simpson resigned from SPP, reporting that his "relationship with them had become very strained." He stated, "I don't know if [the resignation] was in regard to us suing NASCAR. It was in regard to us protecting the name, the Simpson name, that I worked so hard to build a spotless reputation."

[¶ 8] Having completed its investigation into the Earnhardt crash, NASCAR held another press conference on August 21, 2001, to report its results. Schwab, Horn, Voyles,

Simpson,[2] and other SPP representatives attended the press conference. The results of NASCAR's investigation indicated a number of factors, including a failure of the seatbelt, contributed to Earnhardt's death. Simpson felt that NASCAR's statement was inadequate and that SPP was not exonerated. Following the press conference, the group from SPP "huddled briefly" and agreed to meet in the next few days to decide how to respond.

[¶ 9] On September 5, 2001, Horn and Voyles participated in a conference call with Schwab to discuss an appropriate course of action for SPP. The attorneys reported the conclusions they had reached as a result of their investigation, and offered their opinions about SPP's likelihood of success in a lawsuit against NASCAR. Schwab then indicated that SPP's relationship with NASCAR was improving and stated that he had discussed the possibility of the lawsuit with SPP corporate counsel and they predicted a remote chance of success. Schwab then told Voyles and Horn that SPP had no interest in pursuing a lawsuit against NASCAR.

[¶ 10] When Schwab decided that SPP would not sue NASCAR, the purpose for which Horn had been hired—to participate in the investigation and evaluate the possibility of a lawsuit by SPP against NASCAR—was complete. Although no formal termination letter was written, it appears that following the September 5th conference call, Horn's representation of SPP did, in fact, end. No further services were requested of Horn, Horn did not bill SPP for any work thereafter, and according to Schwab, "there was no communication one way or the other to Mr.

---

1. Professor John Burman has made the following observation regarding engagement and termination letters:

> The use of an engagement letter, always a good idea, is even more important when a lawyer represents multiple parties in a transaction and/or an entity. The letter can, and should, identify the client(s), the payer, and the scope of representation. Identifying the client is particularly important when an entity, or nascent entity, is involved. The letter should specify whether the lawyer represents the entity, [individuals] within the entity, or both. Normally, a lawyer represents the organization, and not the individuals within the organization. *See*

> Wyoming Rules of Professional Conduct 1.13(a) (LEXIS 1999). If the entity is a client, the letter should identify the person or persons with whom the attorney should interact and upon whom he or she may rely for direction in the representation.

John M. Burman, *Conflicts of Interest in Wyoming*, 35 Land & Water L.Rev. 79, 88 n. 32 (2000).

2. Although Simpson had resigned from SPP, he continued to speak for the company. The NASCAR press conference was his final appearance on behalf of SPP.

Horn after that date." Horn prepared a final bill totaling $40,383.29, which he submitted to SPP in October of 2001.

[¶ 11] Two months after SPP decided it would not pursue an action against NASCAR, Simpson decided to sue NASCAR on his own. He contacted Voyles and Horn to inform them that he planned to sue and to ask their opinion. Simpson told them that he was going to send them a "pile of information" to look over to determine if there was a basis for his individual lawsuit. Horn and Voyles sought the assistance of Dick Cardwell, an Indianapolis lawyer with special expertise in libel issues, and the three attorneys began preparing the lawsuit for Simpson.

[¶ 12] Although Simpson had resigned from SPP, there was continued discussion between Simpson and SPP about the possibility of his returning to the company in some capacity. Simpson was adamant that he would only return if SPP agreed to go forward with the lawsuit against NASCAR. Because of the continued negotiations between Simpson and SPP, the first draft of the lawsuit against NASCAR included both Simpson individually and SPP as named plaintiffs. When SPP received a draft of the complaint in late January 2002, or early February 2002, Schwab immediately called Horn and Voyles to inform them that SPP had no interest in the lawsuit, and issued a press release announcing that SPP was not suing NASCAR. On February 13, 2002, Simpson, as the lone plaintiff, filed the suit against NASCAR.

[¶ 13] When SPP received Horn's bill, Chuck Davies (Davies), who was acting as the company's CEO following Simpson's resignation, was "uncomfortable" with the amount and told Horn that SPP would pay "$10,000 a month until it was either paid in full or I decide I had paid enough." Davies approved two $10,000 payments on Horn's bill: one in December of 2001 and the other in January of 2002. On February 28, 2002, Horn received an email from Davies informing him that SPP would make no further payments. The email stated, "I think that the [$]20,000 we have paid you is the most we consider reasonable for the only bill you sub-

mitted in October representing work you said was for several earlier months." Davies later testified that he probably would have paid the entire amount had Horn not prepared the lawsuit for Simpson.

[¶ 14] On March 19, 2002, Horn filed a lawsuit to collect the unpaid balance of his bill. Following a two-day trial, the district court took the matter under consideration. Less than one month later, a decision letter finding in favor of Horn was sent to the parties; and on April 21, 2003, the district court entered a judgment in the amount of $20,383.29 in favor of Horn. SPP filed a notice of appeal on May 13, 2003.

## STANDARD OF REVIEW

[¶ 15] " 'When a trial court in a bench trial makes express findings of fact and conclusions of law, we review the factual determinations under a clearly erroneous standard and the legal conclusions *de novo.*' " *Schlesinger v. Woodcock,* 2001 WY 120, ¶ 13, 35 P.3d 1232, 1237 (Wyo.2001) (*quoting Rennard v. Vollmar,* 977 P.2d 1277, 1279 (Wyo.1999)). The parties do not dispute the findings of fact; rather, SPP argues that, as a matter of law, the district court erred in its application of Rule 1.9. We will review this legal conclusion *de novo.*

## *DISCUSSION*

[¶ 16] SPP claims that Horn violated Rule 1.9 when he represented Simpson in the lawsuit against NASCAR, and therefore he should be required to forfeit his fee. Horn contends that his representation of Simpson was not in violation of the rule inasmuch as the lawsuit against NASCAR was not "materially adverse" to the interests of SPP. Rule 1.9(a) reads:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation except that when the former client is a governmental entity, consent is not permitted.

A Rule 1.9 violation is established by proof of four elements:

First, there must have been a valid attorney-client relationship between the attorney and the former client.... Second, the interests of the present and former clients must be materially adverse.... Third, the former client must not have consented, in an informed manner, to the new representation.... Finally, the current matter and the former matter must be the same or substantially related.

*Sullivan County Regional Refuse Disposal Dist. v. Town of Acworth*, 141 N.H. 479, 686 A.2d 755, 757 (1996).

[¶ 17] When a lawyer violates Rule 1.9, a number of remedies are available to the aggrieved party: many seek disqualification of the attorney or his firm, others may pursue a malpractice action, and others file a grievance. John M. Burman, *Conflicts of Interest in Wyoming*, 35 Land & Water L.Rev. 79, 96 (2000). "Courts have also responded to inappropriate conflicts by ordering the forfeiture of attorney's fees...." *Id.* at 96 n. 74; *see, for example, Cal Pak Delivery, Inc. v. United Parcel Service, Inc.*, 52 Cal.App.4th 1, 14, 60 Cal.Rptr.2d 207, 215 (1997) and *Jeffry v. Pounds*, 67 Cal.App.3d 6, 9, 136 Cal.Rptr. 373, 375 (1977); *see also* Charles W. Wolfram, *Modern Legal Ethics* § 7.1.7.

[¶ 18] Before we can determine whether forfeiture of Horn's fee is appropriate, we must first determine whether each of the four elements necessary to establish that Horn violated Rule 1.9 is present. The first element, which requires a valid attorney-client relationship with the former client, is not contested by SPP. The second element, which requires that the interests of the present and former clients be materially adverse, is the issue on which this case turns. If the interests of Horn's present client Simpson, and his former client SPP, are not materially adverse, then Horn did not violate Rule 1.9; and if he did not violate Rule 1.9, then SPP is obligated to pay the entire amount of Horn's attorney's fees.[3]

[¶ 19] We must first ascertain what is meant by "materially adverse." "There is a paucity of authority interpreting the adversity requirement of ABA Rule 1.9." *Selby v. Revlon Consumer Products Corp.*, 6 F.Supp.2d 577, 580 (N.D.Tex.1997). Rule 1.9, cmt. 1 says, "[t]he principles in Rule 1.7 determine whether the interests of the present and former client are adverse." Rule 1.7(a) provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

Rule 1.7, cmt. 2 provides:

[A] lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. On the other hand, simultaneous representation in unrelated matters of clients whose interest[s] are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients. Paragraph (a) applies only when the representation of one (1) client would be directly adverse to the other.

Rule 1.7, cmt. 6 further states that "[p]aragraph (a) prohibits representation of opposing parties in litigation."

[¶ 20] As the comments to Rule 1.7 indicate, most alleged conflicts of interest relating to former clients arise when a lawyer is representing a new client who is suing a former client. *ABA/BNA Lawyers' Manual on Professional Conduct* § 51:220 (2002).

In that scenario, the alignment of the current and former clients as foes in the litigation makes it obvious that their interests are adverse.... For this reason, much of the case law involving efforts to disqualify a lawyer on the ground of a

---

**3.** We note that while SPP suggested to the district court that Horn's fee was excessive and that the fee did not reflect the value the company received from his services, this is not the position SPP has taken on appeal. On appeal, SPP's refusal to pay is founded solely on the alleged violation of Rule 1.9.

former-client conflict simply recites the adversity requirement and, with little discussion, finds it to be satisfied. *Id.* However, the question of whether representation is "materially adverse" to a former client becomes less clear in situations like the present, where the former client, although not directly involved in the litigation, may be affected by it in some manner. *Id.* Under these circumstances, we must make a case-specific inquiry to determine the degree to which the current representation may actually be harmful to the former client. *Id.; State ex rel. McClanahan v. Hamilton,* 189 W.Va. 290, 430 S.E.2d 569, 573 (1993). This fact-intensive analysis focuses on whether the current representation may cause legal, financial, or other identifiable detriment to the former client. *ABA/BNA Lawyers' Manual on Professional Conduct, supra,* at § 51:220. Additionally, we must determine "whether the attorney's exercise of individual loyalty to one client might harm the other client or whether his zealous representation will induce him to use confidential information that could adversely affect the former client." *Hamilton,* 430 S.E.2d at 573; *see also Briggs v. Wyoming Nat. Bank of Casper,* 836 P.2d 263, 272 (Wyo.1992) (Urbigkit, C.J., dissenting) and *Carlson v. Langdon,* 751 P.2d 344, 348 (Wyo.1988).

[¶ 21] SPP claims that Horn's representation of Simpson was materially adverse to it because Schwab had advised Horn that SPP did not want to pursue the lawsuit against NASCAR, and because it jeopardized SPP's relationship with NASCAR, its major customer. These two statements are the extent of SPP's argument on this issue, as the bulk of its appellate briefs focuses on the question of whether Horn should be required to forfeit his fee.[4] SPP fails to expound on this argument or point to any facts contained in the record demonstrating any harm the company has suffered, or will suffer, as a result of Horn's representation of Simpson. Contrary to SPP's assertion, the record indicates that the company's relationship with NASCAR

has not been adversely affected. Davies, SPP's CEO, testified at the time of the trial that "the company is doing fine. The company has a good relationship with NASCAR. NASCAR is still our bill board."

[¶ 22] Also, we find nothing in the record indicating that Horn's representation of Simpson compromised his continuing duty of loyalty and confidentiality to his former client, SPP. "The concerns underlying Rule 1.9 are 'the potential for violation of the lawyer's duty of loyalty, as well as the risk that confidential information gained in a prior representation will be used to the disadvantage of the former client.' " *Briggs,* 836 P.2d at 272 (Urbigkit, C.J., dissenting) *(quoting ABA/BNA Lawyers' Manual on Professional Conduct* § 51:202 (1987)). We have held that an irrebuttable presumption of disclosure arises when the interests of a former client are adverse to a client whom the attorney presently represents. *Carlson,* 751 P.2d at 348. Thus, a movant claiming a violation of Rule 1.9 is not required to prove disclosure of confidential information where he can demonstrate that the two matters are substantially related and that his interests are materially adverse to those of the new client. *Id.* SPP fails to point to any disclosure of confidential information or breach of Horn's duty of loyalty, and the irrebuttable presumption of disclosure does not arise in this case, as SPP has failed to demonstrate that its interests are materially adverse to Horn's representation of Simpson.

[¶ 23] We refuse to speculate as to the possible effects, adverse or otherwise, that Horn's representation of Simpson may have had, or could have, on SPP. Based on the facts, as they exist in the record, we hold that Horn's representation of Simpson was not "materially" or "directly" adverse to SPP in violation of Rule 1.9. Because Horn's representation of Simpson was not materially adverse to SPP, the second element of the four-part test is not present. Therefore, we need not address the third factor, whether

4. SPP's appellate brief points to a statement from the district court's decision letter where it wrote, "[h]owever, in sorting this all out, the real issue is, *assuming a violation of Rule 1.9 has occurred,* does that prohibit a recovery of attor-

ney fees." (Emphasis added.) SPP apparently took this statement as conclusively establishing a Rule 1.9 violation and did not examine the issue further.

SPP consented to Horn's representation of Simpson, or the fourth factor, whether the matters were substantially related.

[¶ 24]   Finding no violation of Rule 1.9, we affirm the decision of the district court.